# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REBECCA MYERS,<br>    Plaintiff, | CIVIL ACTION |
| v. | No. 09-2569 |
| GARFIELD & JOHNSON ENTERPRISES, INC., et al.,<br>    Defendants | |

## Memorandum

YOHN, J.                                                          January 14, 2010

Plaintiff, Rebecca Myers, brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 951 et seq., and Pennsylvania common law, against Jackson Hewitt, Inc. ("Jackson Hewitt"); Garfield & Johnson ("G&J"), a licensed franchisee of Jackson Hewitt which does business as "Jackson Hewitt Tax Service"; Frank Johnson, a partner of G&J; and Michael Nolan, a managerial-level employee of G&J. Plaintiff alleges that Johnson and Nolan repeatedly sexually harassed, assaulted, and threatened her during her employment as a tax preparer for G&J and that this behavior forced her to resign from G&J.

Before me is Jackson Hewitt's motion to dismiss plaintiff's amended complaint for failure to state a claim against it. Jackson Hewitt argues that it was not plaintiff's employer under any of the theories alleged by plaintiff and that it is therefore not a proper party to plaintiff's Title VII and PHRA claims. Jackson Hewitt also argues that plaintiff has failed to identify any common-law legal duty on the part of Jackson Hewitt, the breach of which could give rise to a

viable negligence claim. I will deny the motion to dismiss as to the Title VII and PHRA claims and will grant the motion to dismiss as to plaintiff's negligence claim.

## I. Factual and Procedural History

Presuming the truth of all factual allegations in the complaint, as required for the purposes of this motion, the court gathers the following facts.

### A. Plaintiff's Employment with G&J

In December 2007, plaintiff applied over the internet for a position as a tax preparer. (Am. Compl. ¶¶ 15-16.) At the time, plaintiff believed that she was applying for a position at Jackson Hewitt. (*Id.* ¶ 84.) Defendant Nolan, an employee of G&J, called plaintiff about the position, informing her that the position was with "Jackson Hewitt Tax Service." (*Id.* ¶¶ 15, 85.) Plaintiff began working for G&J on January 10, 2008. (*Id.* ¶ 20.) Nolan was her immediate supervisor. (*Id.* ¶¶ 13, 21.)

Before beginning employment, plaintiff was required to take a tax preparation class, all instructional materials for which were prepared by Jackson Hewitt and available online through Jackson Hewitt's intranet web site, an internal site that is accessible to Jackson Hewitt's franchises. (*Id.* ¶¶ 16-17.) Plaintiff was also required to complete several Jackson Hewitt-prepared training "modules" and to take a "Tax Preparer Readiness Test" on the intranet site before she began employment. (*Id.* ¶¶ 18-20.) Such training and testing was required of all G&J employees. (*Id.* ¶ 75.) All training materials were stamped with the Jackson Hewitt name and logo. (*Id.* ¶ 86.)

Plaintiff also received a written code of conduct ("Jackson Hewitt Code of Conduct") that prohibited harassment and discrimination in the workplace. (*Id.* ¶ 78; Pl.'s Opp. to Def.'s Mot. to

Dismiss ("Pl.'s Opp.") Ex. I,[1] at 4.) The Jackson Hewitt Code of Conduct makes no reference to

G&J and is riddled with references to the reader as an "employee" of Jackson Hewitt. (*See* Pl.'s

Opp. Ex. I.) The Code also states that the terms "Jackson Hewitt" and "the Company" are "used

interchangeably to refer to Jackson Hewitt Tax Service Inc. or to Jackson Hewitt Tax Service Inc.

and its subsidiaries, as appropriate to the context." (*See id.* at 2.) To the extent that any

"subsidiaries or affiliates" publish their own codes of conduct that may be inconsistent with the

Jackson Hewitt Code of Conduct, the Jackson Hewitt Code of Conduct is to "take precedence."

(*Id.*) The Code also encourages the reader to report any concerns to a supervisor, to "the Human

Resources Department," or directly to "Jackson Hewitt's Legal Department, Jackson Hewitt's

Chief Compliance Officer or the 'Integrity Hotline'," a service established by Jackson Hewitt.

(*See id.* at 3.)

After she began employment, plaintiff continued to use Jackson Hewitt's intranet web site

and to interact with Jackson Hewitt employees. In addition to its use for training and testing

purposes, the intranet site enabled franchise employees to apply for positions within the Jackson

Hewitt network, obtain information about Jackson Hewitt policies, and communicate with

Jackson Hewitt representatives. (Am. Compl. ¶ 17.) G&J employees were required to submit all

client tax returns to Jackson Hewitt for review and filing with the IRS. (*Id.* ¶¶ 74-75.) Tax returns

were never filed until approved by Jackson Hewitt personnel. (*Id.* ¶ 90.) As required by the

franchise agreement, G&J managed its payroll system over Jackson Hewitt's intranet connection,

which enabled Jackson Hewitt to access G&J's payroll information remotely. (*Id.* ¶ 76; *see also*

Def.'s Mot. to Dismiss ("Def.'s Mot.") Ex. B, at ¶¶ 16.1-16.2 (Standard Franchise Agreement,

---

[1] Exhibits B through I of plaintiff's opposition have been filed under seal in order to protect trade secrets. This opinion does not refer to any protected information.

granting Jackson Hewitt the "right, but not the obligation," to inspect franchisees' office locations and granting Jackson Hewitt permission to inspect the contents of computers at those locations).) Franchise employees, including plaintiff, also called Jackson Hewitt's offices directly in order to resolve problems involving tax returns or the computer system. (Am. Compl. ¶ 90.)

According to plaintiff, she was "not aware of the existence of the entity Garfield & Johnson Enterprises, Inc. until she received her first paycheck." (*Id.* ¶ 88.) When she asked Nolan what G&J was, Nolan told her it was a Jackson Hewitt franchise. (*Id.*) Plaintiff was told by her supervisors at G&J to answer the telephone as "Jackson Hewitt." (*Id.* ¶ 87.)

Beginning shortly after she began working for G&J, Nolan made repeated unwelcome sexual remarks to plaintiff. (*Id.* ¶ 24.) Plaintiff complained about Nolan's behavior to Johnson, who then also began to harass plaintiff. (*Id.* ¶¶ 26-27.) Howard Garfield, another partner at G&J, was aware of Johnson's harassment of plaintiff but failed to take action to prevent it. (*Id.* ¶ 29.) Another employee of G&J was also aware of some of the harassment. (*Id.* ¶ 32.) Sometime in March, Nolan wrote in a performance evaluation of Myers that she "should experience what Nicole Brown Simpson did." Johnson then "circulated the evaluation to several other Garfield & Johnson and/or Jackson Hewitt managers and supervisors." (*Id.* ¶ 35.) Plaintiff learned about this evaluation on March 26, 2008. (*Id.*) Plaintiff complained to Johnson about the evaluation. (*Id.* ¶ 38.) Johnson responded that he "wrote Nolan up" for the remark in the evaluation, but Johnson then solicited oral sex from plaintiff. (*Id.* ¶¶ 39-40.)

On March 27, 2008, plaintiff told another supervisor, Melissa Orth, that she was afraid of Nolan. Orth encouraged plaintiff to report Nolan's threat to the police, which plaintiff did that same day. (*Id.* ¶¶ 42, 44.) The police called Nolan and Johnson to the station and Nolan stated that the threatening statement in his evaluation was meant "as a joke." (*Id.* ¶¶ 45-46.) Johnson

supported Nolan's statement. (*Id.* ¶ 46.) The police took no action and plaintiff resigned from her

employment that day. (*Id.* ¶¶ 47-48.) On August 25, 2008, plaintiff filed a timely charge of

discrimination with the Pennsylvania Human Relations Commission against both G&J and

Jackson Hewitt (which are named in the charge, respectively, as "Jackson Hewitt Tax Service"

and "Jackson Hewitt Tax Services, Inc."). Plaintiff received a right to sue letter on March 26,

2009.

### B. Jackson Hewitt's Relationship to G&J and to Plaintiff

Jackson Hewitt's Standard Franchise Agreement[2] states that "[n]either [the franchisee],

nor [its] manager or . . . employees shall be considered or represented as our employees or

agents." (Def's Mot. Ex. B, ¶ 13.6.) Franchisees and franchise employees are not authorized to

enter into any contract or agreement with a third party on Jackson Hewitt's behalf. (*Id.* ¶ 13.7.)

At each franchise location and on all of the franchisee's business cards, contracts, and other

documents, the franchisee is required to list the name of the legal entity that owns the franchise

and state that the franchise is "independently owned and operated." (*Id.* ¶ 13.9.) Franchisees are

not authorized to enter into any contract under any name similar to "Jackson Hewitt." (*Id.*)

However, as franchisor, Jackson Hewitt exercises significant control over G&J's daily

operations. Jackson Hewitt publishes detailed policies and procedures for its franchisees, which it

disseminates to the franchisees over the intranet system. (Am. Compl. ¶¶ 74, 78.) Jackson Hewitt

---

[2] Plaintiff has incorporated portions of the Standard Franchise Agreement into the Amended Complaint.(*See, e.g.*, Am. Compl. ¶ 77.) As a result, I may consider relevant portions of that agreement without converting this motion into a motion for summary judgment. *See Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2002). Although the actual agreement between G&J and Jackson Hewitt is not in the record before me (*see* Pl.'s Opp. 3), plaintiff argues that the Standard Franchise Agreement is to some degree representative of any agreement between G&J and Jackson Hewitt. (*See* Am. Compl. ¶ 77 ("Further examples of the extensive control exerted by Jackson Hewitt, Inc. over its franchisees including Garfield & Johnson are found in the following sections of the standard franchise agreement . . . .").)

also publishes and periodically updates a compliance manual setting forth "mandatory standards, specifications and requirements of the franchised system," the terms of which were considered provisions of the franchise agreement itself. (Def.'s Mot. Ex. B, ¶ 12.1; Am. Compl. ¶ 77.) This manual, *inter alia*, specifies the hours at which franchise locations are to be open and requires franchisees to compensate customers for any mistake that the franchisees make, as determined by Jackson Hewitt. (Am. Compl. ¶ 77; Def.'s Mot. Ex. B, ¶¶ 13.5, 13.14.2.) It also prescribes various office and training procedures to ensure quality and prevent tax fraud. (Pl.'s Opp. Ex. B, Parts III-V.) For example, the manual sets mandatory retention spans for all office paperwork, establishes workplace procedures to protect confidentiality, and requires compliance training for all tax preparers at the franchise. (*Id.* at III-4 to -5.)

The compliance manual ultimately leaves to the franchisee many decisions with respect to hiring employees. (*Id.* at IV-8.) The Standard Franchise Agreement specifies that the franchisee retains the "sole right to select, hire and discharge [its] employees" and is responsible for "all decisions" regarding employment. (Def.'s Mot. Ex. B, ¶ 13.6.) However, Jackson Hewitt requires that G&J's management and tax preparation employees complete training programs designed by Jackson Hewitt and monitors all such training. (Am. Compl. ¶ 77; Def.'s Mot. Ex. B, ¶ 11.2; Pl.'s Opp. Ex. B, Part V.) The manual also refers to certain circumstances in which the franchisee is immediately required to dismiss an employee. (Pl.'s Opp. Ex. B, at IV-4(2), (3).) The franchise agreement is terminable if any employee or manager fails to complete the required Jackson Hewitt training, if the franchisee commits "any act within or without the Franchised Business that would tend, in [Jackson Hewitt's] opinion, to reflect poorly on the goodwill of [Jackson Hewitt's] name" or marks, or violates any law or regulation pertaining to the franchised business. (Am. Compl. ¶ 77; Def's Mot. Ex. B, ¶ 20.2(u), (v).)

Both Jackson Hewitt and G&J are covered by Title VII as both employ more than fifteen individuals. (Am. Compl. ¶ 14.)

The parties have also attached to their briefs various documents the contents of which were not discussed in the Amended Complaint. These documents include portions of plaintiff's employment application, IRS and Department of Homeland Security forms that plaintiff completed before beginning employment with G&J, the "Garfield & Johnson Team Member Code of Conduct," and the "Jackson Hewitt Tax Preparation Code of Conduct."[3] (Def.'s Mot. Ex. A; Pl.'s Opp. Ex. C.) "In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004). If, on a motion pursuant to Rule 12(b)(6), "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment . . . and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b). "Documents that the

---

[3] Jackson Hewitt argues that the court may consider the job application form that plaintiff completed without converting the instant motion into a motion for summary judgment because plaintiff's complaint refers to the application. (Def.'s Mot. 6 n.4.) However, the paragraph of the Amended Complaint to which Jackson Hewitt refers states that plaintiff applied online for the position in December 2007. (Am. Compl. ¶ 15.) The application form that Jackson Hewitt attaches is dated January 5, 2008, and was completed by hand. (*See* Def.'s Mot. Ex. A.) It therefore appears that the application to which plaintiff refers in the Amended Complaint is a different document from the one that Jackson Hewitt has submitted.

Similarly, although plaintiff alleges in her complaint that she received a "code of conduct" (Am. Compl. ¶ 78), she was apparently referring only to the Jackson Hewitt Code of Conduct, not the Garfield & Johnson Team Member Code of Conduct or the Tax Preparer Code of Conduct. The Amended Complaint states that Jackson Hewitt published the code of conduct and that the code of conduct prohibited harassment and discrimination in the workplace. Of the three codes of conduct that the parties have submitted, only the Jackson Hewitt Code of Conduct fits that description. Moreover, plaintiff alleges that she never received the Garfield & Johnson Team Member Code of Conduct. (*See* Pl.'s Opp., Aff. of Rebecca Myers ¶ 6.)

defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim; as such, they may be considered by the court" without converting a 12(b)(6) motion into a motion for summary judgment, provided that neither party disputes the document's authenticity. *Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2002) (quoting 27A Fed. Proc., L. Ed. § 62:466 (West 2009)). The court may also consider "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Id.* None of the supplemental documents fall into any of the above-described exceptions to the general prohibition against considering documents outside the complaint in the context of a motion to dismiss for failure to state a claim. Because the parties have not had the opportunity to conduct substantial discovery, I will decline to consider the contents of these documents in order to avoid converting the motion into one for summary judgment.

## II. Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the "sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). When evaluating a motion to dismiss, the court must accept as true all well-pleaded allegations of fact in the plaintiff's complaint and must view any reasonable inferences that may be drawn therefrom in the light most favorable to the plaintiff. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009); *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This statement must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "While a

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Id.* (citations and alterations omitted). Furthermore, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ." *Id.* (citations and footnote omitted).

In *Ashcroft v. Iqbal*, the Supreme Court discussed "[t]wo working principles" underlying *Twombly*. 129 S. Ct. 1937, 1949 (2009). "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950 (citing *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Id.* (internal alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

## III. Discussion

Plaintiff has asserted four counts against Jackson Hewitt, each of which relies on a different theory of liability. Counts III through V set forth various theories according to which Jackson Hewitt is liable for G&J's violations of Title VII and the Pennsylvania Human Relations Act, "as well as all state law tort claims as set forth elsewhere herein." (Am. Compl. ¶¶ 82, 93,

96.)[4] Count VI alleges that Jackson Hewitt is directly liable for plaintiff's injuries as a result of its negligent failure to control, train, or monitor G&J and its employees. (*Id.* ¶ 104.) Jackson Hewitt challenges plaintiff's complaint on the following grounds: (1) Jackson Hewitt was not plaintiff's employer and is therefore not liable to plaintiff under either Title VII or the PHRA; and (2) plaintiff has failed to state a claim in Count VI because Jackson Hewitt owed her no duty to ensure a non-discriminatory workplace. I conclude that plaintiff's complaint does include factual allegations that, if true, could plausibly lead to a conclusion that Jackson Hewitt was her employer. However, I conclude that plaintiff has not alleged any facts that would give rise to a common-law duty on the part of Jackson Hewitt to protect her from sexual harassment. As a result, I will deny Jackson Hewitt's motion to dismiss as to Counts III through V and grant its motion to dismiss as to Count VI.

### A. Plaintiff's Title VII and PHRA Claims

In Counts III through V of the Amended Complaint, plaintiff argues that Jackson Hewitt is liable for G&J's violations of Title VII and the PHRA because: (1) Jackson Hewitt was plaintiff's "joint employer" for the purposes of those statutes (Am. Compl. ¶ 96 (Count V)); (2) Jackson Hewitt exercised sufficient control over G&J to give rise to an agency relationship between those two entities (*id.* ¶ 82 (Count III)); and (3) Jackson Hewitt was plaintiff's "ostensible or apparent employer" because it held itself out to plaintiff as her employer and because it exercised extensive apparent control over G&J's operations (*id.* ¶ 93 (Count IV)). Jackson Hewitt argues that, in the Third Circuit, multiple entities may be held liable for the same Title VII violation only when they are properly considered a "single employer" for the purposes

---

[4] Counts I and II of the Amended Complaint are directed solely at G&J. Counts VII through XI are state law claims directed solely at Nolan and Johnson.

of Title VII. (Def.'s Mot. 4.)[5] Jackson Hewitt further argues that plaintiff has not alleged facts that would justify viewing Jackson Hewitt and G&J as a single employer. (*Id.* at 4-5.)

I conclude that, in the Third Circuit, two distinct entities may be liable for the same Title VII violation not only when they constitute a "single employer" but also when they are joint employers of the plaintiff or when one entity acted as the agent of the other. I also find that plaintiff has alleged sufficient facts from which to conclude either that Jackson Hewitt was her joint employer or that Jackson Hewitt was plaintiff's employer by virtue of its actual or apparent authority over G&J's employment practices. Because plaintiff has not alleged that Jackson Hewitt and G&J should be considered a single employer for the purposes of Title VII (*see* Pl.'s Opp. 13), it is unnecessary to decide whether the Amended Complaint alleges sufficient facts to support such a claim. I will therefore deny Jackson Hewitt's motion to dismiss as to Counts III through V.

### 1. Legal Standard

Title VII and the PHRA prohibit "employers" from discriminating against employees and applicants for employment. 42 U.S.C. § 2000e-2(a); 43 Pa. Stat. Ann. § 955(a). Title VII defines "employer"—with certain exceptions not relevant to this matter—as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). Jackson Hewitt does not dispute that it maintains the requisite number of employees or that it is engaged in an industry affecting commerce. It also does not dispute that it is a covered employer under the PHRA. *See* 43 Pa. Cons. Stat. Ann. § 954(b)

---

[5] Jackson Hewitt does not directly challenge the state law tort claims set forth in Counts III and V. I address Jackson Hewitt's challenge to the state law tort claims set forth in Count IV *infra*, Part III.A.4.

(defining "employer"). Rather, Jackson Hewitt argues that plaintiff was not at any relevant time one of its "employees."[6]

The statutory language of Title VII contains no clear definition of the term "employee." *See* 42 U.S.C. § 2000e(f) (defining "employee" as "an individual employed by an employer"); *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 444 (2003) (describing an identical definition of "employee" in the Americans with Disabilities Act as "completely circular and explain[ing] nothing" (internal quotation marks omitted)). Similarly, the PHRA does not define either "employer" or "employee" except through certain enumerated exceptions that are inapplicable to plaintiff. 43 Pa. Cons. Stat. Ann. § 954(b), (c). "[W]hen Congress has used the term 'employee' without defining it, [the Supreme Court has] concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." *Clackamas*, 538 U.S. at 445 (internal quotation marks omitted) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-323 (1992)). *See also Hull v. Rose, Schmidt, Hasley & DiSalle P.C.*, 700 A.2d 996, 1000 (Pa. Super. Ct. 1997) (holding that the PHRA's definition of "employee" should be interpreted according to the word's "common meaning and accepted usage" and in light of Title VII case law).[7]

The common-law test for an employment relationship focuses on the functional relationship between the parties. *Clackamas*, 538 U.S. at 450. Neither the official title of an

_____

[6] The PHRA also prohibits employers from discriminating against independent contractors. 43 Pa. Stat. Ann. § 955(a). Plaintiff does not allege that she worked as an independent contractor for Jackson Hewitt.

[7] The parties' briefs focus on Title VII case law and neither party argues that the court should conduct a different, separate analysis of Jackson Hewitt's status as plaintiff's employer under the PHRA. Accordingly, I will assume for the purposes of this motion that, if plaintiff is entitled to proceed with her Title VII claims against Jackson Hewitt, she is also entitled to proceed with her PHRA claims against Jackson Hewitt.

individual's position nor the existence of an employment agreement is dispositive. *Id.* The court

must instead look to the extent to which the plaintiff's work was "'controlled or [was] subject to

the right to control by'" the defendant, *see id.* at 448 (quoting Restatement (Second) of Agency §

2(2) (1958)), particularly the extent to which the master controls the "manner and means of the

agent's performance of work," Restatement (Third) of Agency § 7.07(3)(a) (2006) (defining

employer/employee relationship).[8] The employer is generally the entity that "owns and manages

the enterprise," decides whether to hire and fire employees, "assign[s] tasks to employees and

supervise[s] their performance," and decides how profits and losses are to be distributed. *Id.* at

450. However, "no one factor [is] decisive." *Id.* at 451 (quotation omitted). Overall, "the precise

---

[8]  The Third Restatement has replaced the words "master" and "servant" with "employer" and "employee," paralleling the reasoning in *Clackamas*. Restatement (Third) of Agency § 2.04 cmt. a. According to the Restatement, the following indicia are relevant to the existence of an employer/employee relationship:

> [T]he extent of control that the agent and the principal have agreed the principal may exercise over details of the work; whether the agent is engaged in a distinct occupation or business; whether the type of work done by the agent is customarily done under a principal's direction or without supervision; the skill required in the agent's occupation; whether the agent or the principal supplies the tools and other instrumentalities required for the work and the place in which to perform it; the length of time during which the agent is engaged by a principal; whether the agent is paid by the job or by the time worked; whether the agent's work is part of the principal's regular business; whether the principal and the agent believe that they are creating an employment relationship; and whether the principal is or is not in business. Also relevant is the extent of control that the principal has exercised in practice over the details of the agent's work.

*Id.* § 7.07 cmt. f. *See also Darden*, 503 U.S. at 323 (listing factors similar to those listed in the Restatement, as well as "whether the hiring party has the right to assign additional projects to the hired party," "the extent of the hired party's discretion over when and how long to work," "the hired party's role in hiring and paying assistants," "whether the hiring party is in business," "the provision of employee benefits," and "the tax treatment of the hired party." (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-752 (1989))).

contours of an employment relationship can only be established by a careful factual inquiry." *Graves*, 117 F.3d at 729.

### 2. "Joint Employer" Theory of Liability

In Count V[9] of the Amended Complaint, plaintiff alleges that "Jackson Hewitt exercised sufficient control over Garfield & Johnson employees to be a 'joint employer'" of plaintiff. (Am. Compl. ¶ 95.) Jackson Hewitt argues that plaintiff's "joint employer" theory is actually an attempt to characterize Jackson Hewitt and G&J as a "single employer" for Title VII purposes. (*See* Def.'s Mot. 4.) Jackson Hewitt further argues that plaintiff's allegations fall short of actually showing that the two businesses are a single entity under the criteria set forth in *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 85-88 (3d Cir. 2003). However, the "joint employer" doctrine, on which plaintiff relies in Count V, is distinct from the "single employer" doctrine and is available in the Third Circuit in Title VII contexts. I will therefore deny Jackson Hewitt's motion to dismiss as to Count V.

As the Third Circuit explained in *NLRB v. Browning-Ferris Industries of Pennsylvania*, a case arising under the National Labor Relations Act ("NLRA"),[10] a joint employment relationship may exist when "one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." 691 F.2d 1117, 1123

---

[9] I have chosen to address plaintiff's "joint employer" claim first, despite the fact that it appears later in the Amended Complaint than the agency-based claims set forth in Counts III and IV, in the interest of clarity. The viability of all three of these counts depends on the failure of Jackson Hewitt's argument that the "single employer" theory of liability is the only means by which plaintiff can establish Jackson Hewitt's liability under Title VII or the PHRA. Most of the decisions undermining this argument concern the "joint employer" theory of liability.

[10] The NLRA, like Title VII and the PHRA, does not contain an explicit definition of the word "employee." *See* 29 U.S.C. § 152(3).

(3d Cir. 1982). Unlike a "single employer" relationship, which may arise when "nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer,'" *id.* at 1122, ""a finding that companies are 'joint employers' assumes in the first instance that companies are . . . independent legal entities that have merely 'historically chosen to handle jointly important aspects of their employer-employee relationship,'" *id.* (internal alteration omitted) (quoting *NLRB v. Checker Cab Co.*, 367 F.2d 692, 698 (6th Cir. 1966)).

The Third Circuit has extended the "joint employer" theory of liability to the Title VII context. *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997). As in the NLRA context, a joint employer relationship may exist for the purposes of Title VII when "two entities exercise significant control over the same employees." *Id.* (citing *Browning-Ferris*, 691 F.2d at 1123). District courts in the Third Circuit have distilled the "joint employer" analysis to three factors:

> 1) [A]uthority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; 2) day-to-day supervision of employees, including employee discipline; and 3) control of employee records, including payroll, insurance, taxes and the like.

*Butterbaugh v. Chertoff*, 479 F. Supp. 2d 485, 494 (W.D. Pa. 2007) (quoting *Cella v. Villanova Univ.*, No. 01-7181, 2003 U.S. Dist. LEXIS 2192, at *22 (E.D. Pa. Feb. 12, 2003). No single factor is dispositive and a weak showing on one factor may be offset by a strong showing on the other two. *Id.* at 496-97. The parties' beliefs and expectations regarding the relationship between the plaintiff and defendant are also relevant. *Graves*, 117 F.3d at 727-29.

Jackson Hewitt argues that the Third Circuit's more recent decision in *Nesbit* rejected the "joint employer" test as it was described in *Browning-Ferris* as inappropriate in the Title VII context and replaced that test with its own framework that was to be the exclusive means by which two entities may be jointly liable under Title VII. (Def.'s Mot. 4.) That decision, however,

addressed only the "single employer" theory, not the "joint employer" theory. *See Nesbit*, 347 F.3d at 84. Since *Nesbit*, lower courts in the Third Circuit have continued to consider the "joint employer" test to be available in the Title VII context. *See, e.g.*, *Butterbaugh*, 479 F. Supp. 2d at 493-44; *Daniel v. City of Harrisburg*, No. 05-2126, 2006 U.S. Dist. LEXIS 18529, at *5-9 (M.D. Pa. Mar. 6, 2006).

Moreover, the discussion in *Nesbit* is limited to the specific situation in which a plaintiff seeks to evade Title VII's minimum size requirements by "consolidating" a defendant with an affiliated entity, thus allowing the employees of both entities to count toward the statutory minimum. *See Nesbit*, 347 F.3d at 85 (adopting a restrictive approach toward the "single employer" analysis in order to protect Congress' perceived goal of "spar[ing] small companies the considerable expense of complying with [Title VII's] many-nuanced requirements").[11] As a result, a number of lower courts have questioned the relevance of *Nesbit* even to the "single employer" analysis when it is undisputed that the defendant employs more than the statutory minimum number of individuals. *See Daniel*, 2006 U.S. Dist. LEXIS 18529, at *9 (applying *Nesbit* only because both parties believed that it was applicable and only after finding that the plaintiff had not made sufficient allegations to satisfy the "joint employer" test as set forth in *Graves*); *Schepis v. Raylon Corp.*, No. 03-5970, 2006 U.S. Dist. LEXIS 70190, at *12-13 (E.D. Pa. Sept. 26, 2006) (applying the *Browning-Ferris* "single employer" test in Title VII case where

---

[11] The defendant in *Nesbit* was a small company that, as the plaintiff conceded, employed fewer than fifteen persons during the relevant time period. *Nesbit*, 347 F.3d at 74. The plaintiff argued that, in determining whether the defendant was a covered employer, the court should also count the employees of an affiliated business. *Id.* at 74. Counted together, the two businesses had over fifteen employees. *Id.* Because the affiliated business was not itself a named defendant, the court had no occasion to address the question of whether that business was the plaintiff's joint employer.

it was undisputed that purported employers had the statutory minimum number of employees).[12] *Cf. Butterbaugh*, 479 F. Supp. 2d at 491 (dismissing the "single-employer test" in *Nesbit* as "more tailored to unraveling purposefully convoluted corporate structures" than to the typical joint employment relationship), 492-93 (reasoning that the term "employee" should be interpreted more strictly when determining whether the defendant employed the statutory minimum number of employees under Title VII than when determining whether the defendant employed the plaintiff).

Like the defendants in *Daniel*, *Crosby*, and *Butterbaugh*, Jackson Hewitt does not argue that it has fewer than fifteen employees. There is therefore no particular cause for concern that subjecting Jackson Hewitt to liability will run afoul of Congress' goal of protecting smaller employers. *See Butterbaugh*, 479 F. Supp. 2d at 492 (noting that, unlike Title VII's definition of "employer," which contained a minimum size requirement, Title VII's definition of "employee" "contains nothing that obviously cabins the operation of Title VII, leaving intact the full sway of the statute's remedial purpose").

Although Jackson Hewitt's motion focused primarily on the "single employer" analysis in *Nesbit*, there is some overlap between the factors in the *Nesbit* framework and those in the "joint employer" framework. For example, the court in *Nesbit* considered the degree to which one entity directed the discriminatory conduct of another, whether one company covered the salaries of the other, and the "degree of unity" between the two entities with respect to hiring and

---

[12] An ADA case cited by Jackson Hewitt, *Crosby v. UPMC*, No. 07-501, 2009 U.S. Dist. LEXIS 23736, at *27 (W.D. Pa. Mar. 20, 2009), also questioned the relevance of *Nesbit* to a situation in which the defendant conceded employing more than fifteen employees, but went on to note that the "analysis in *Nesbit* . . . addressed the broader question concerning substantive consolidation and that analysis is relevant to the case here presented." Ultimately, the court in *Crosby* granted summary judgment to the defendant on other grounds, rendering it unnecessary to decide whether the defendant was the plaintiff's employer. *Id.* at *29-54.

personnel decisions. *See Nesbit*, 347 F.3d at 86-87; *cf. Butterbaugh*, 479 F. Supp. 2d at 494

(holding that relevant factors to the joint employment analysis include "authority to hire and fire

employees, promulgate work rules and assignments, and set conditions of employment," "day-to-

day supervision of employees," and "control of employee records"). Jackson Hewitt's motion

therefore raises some issues that are relevant to the joint employer analysis. In particular, Jackson

Hewitt points out that G&J has the "sole responsibility to select, train, hire, pay, and discharge its

employees" (Def.'s Mot. 6), that Jackson Hewitt exercised no more control over G&J than any

franchisor exercises over its franchisee (*id.* at 8), and that plaintiff was aware of the fact that she

was employed by G&J, a separate entity from Jackson Hewitt (Def.'s Reply 3).[13]

I nevertheless conclude that plaintiff has alleged sufficient facts regarding the joint

employment issue. First, the Amended Complaint includes allegations suggesting that Jackson

has the authority to "promulgate work rules" and "set the conditions of employment."

*Butterbaugh*, 479 F. Supp. 2d at 494. Plaintiff alleges that she was covered by Jackson Hewitt's

sexual harassment and other workplace policies (Am. Compl. ¶ 78; *see* Pl.'s Opp. Ex. I, at 4

(Jackson Hewitt Code of Conduct)) and that Jackson Hewitt had the authority to require G&J

managers to submit to training and to obey all applicable laws (Am. Compl. ¶¶ 79-80). *Cf.*

---

[13] Jackson Hewitt also directs the court's attention to paragraph 13.16 of the Standard Franchise Agreement, stating that franchisees are "solely responsible for ensuring that [their] offices comply with the Americans with Disabilities Act, with any similar state law, and with any local law or ordinance that applies to your office locations." (Def.'s Mot. Ex. B.) However, reading this provision in the light most favorably to plaintiff, it appears that this provision refers primarily to the franchisee's operational and financial responsibility for making architectural modifications to the office location. Since this provision has little to do with the franchisee's employment practices, I find that it is of little relevance to the issue presented.

Jackson Hewitt's arguments regarding the absence of financial integration or overlap in management between Jackson Hewitt and G&J are not relevant to the joint employment analysis. *See Daniel*, 2006 U.S. Dist. LEXIS 18529, at *7-8 (noting that general administrative overlap between two purported employers is "entirely unrelated" to the question of each company's status as a joint employer).

*Graves*, 117 F.3d at 728 (finding that the county was the co-employer of judicial clerks who were subject to the county's personnel policies and believed that the county had the "authority to intervene" to protect them from sexual harassment). The Jackson Hewitt Code of Conduct, which plaintiff discussed in the Amended Complaint, also requires that franchisees terminate their employees in certain circumstances, which further supports plaintiff's allegations that Jackson Hewitt exercised significant control over hiring and firing decisions. (Pl.'s Opp. Ex. B, at IV-4(2), (3).) That the Standard Franchise Agreement[14] disclaims any responsibility on Jackson Hewitt's part to train franchise employees and states that G&J has exclusive authority over hiring and personnel decisions is a factor weighing against plaintiff's "joint employment" claim, but it is not a decisive one, especially at the pleadings stage. *See, e.g., Graves*, 117 F.3d at 727 (acknowledging that plaintiffs could be employed by both court and county even though court had the "'inherent right' to hire and fire employees").

With respect to the second factor described in *Butterbaugh*, plaintiff alleges that Jackson Hewitt participated in the daily supervision of G&J employees by reviewing all tax returns prior to filing, by assisting employees with problems with tax returns and the computer system, by requiring that she undergo specific training, and by monitoring the completion of such training. (Am. Compl. ¶¶ 16-18, 86, 90; Pl.'s Opp. Ex. B, Part V.) *Cf. Schepis*, 2006 U.S. Dist. LEXIS 70190, at *11-13 (finding triable issue of fact as to whether defendant was plaintiff's co-employer where defendant trained plaintiff, provided products and scripts that shaped plaintiff's work, and where plaintiff had frequent discussions with defendant's employees). As with respect to hiring and personnel decisions, that the Standard Franchise Agreement disclaims any

---

[14] As plaintiff has noted, "neither defendant has produced a copy of the actual franchise agreement between Jackson Hewitt and Garfield & Johnson." (Pl.'s Opp. 3.)

responsibility on Jackson Hewitt's part to train franchise employees does not preclude the possibility that plaintiff will ultimately obtain evidence that Jackson Hewitt actually assumed such responsibility, as she claims it did.

With respect to the third prong of the "joint employment" test, plaintiff alleges that Jackson Hewitt assumed some degree of control over G&J employee records. (Am. Compl. ¶ 76.) Although Jackson Hewitt did not pay plaintiff, no single aspect of the employer/employee relationship is determinative and courts in the Third Circuit have recognized a joint employment relationship even when one employer did not pay the plaintiff's salary. *See, e.g., Graves*, 117 F.3d at 727 (acknowledging that plaintiffs could be employed by both court and county, where county, not the court, paid plaintiffs' salaries but court had the "'inherent right' to hire and fire employees"); *Daniel*, 2006 WL 543044, at *3 (museum, and not city, was plaintiff's employer even though the city paid all of the museum's payroll costs). The joint employer doctrine by definition acknowledges that an individual may be employed by two separate entities that have apportioned the various duties of employer between themselves as they saw fit. *See Graves*, 117 F.3d at 727 (citing *Browning-Ferris*, 691 F.2d at 1123).

Plaintiff also alleges that she was told, and believed, that she was a "Jackson Hewitt" employee. (*Id.* ¶¶ 84-85.) "Although employee expectations are not dispositive of employer status, they are relevant to our analysis." *Graves*, 117 F.3d at 728-29. I must assume for the purposes of this motion that these allegations are true.

Although it is not entirely clear that the allegations in the Amended Complaint will ultimately be sufficient to show that Jackson Hewitt was plaintiff's joint employer, on a motion to dismiss the "'issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *In re Burlington Coat Factory Sec. Litig.*, 114

F.3d 1410, 1420 (3d Cir. 1997) (quoting *Scheuer v. Rhodes*, 416 U. S. 232, 236 (1974)). Plaintiff has made sufficient allegations to state a plausible joint employment claim. I will therefore deny Jackson Hewitt's motion to dismiss as to Count V.

### 3. "Agency" Theory

Count III of plaintiff's complaint alleges that G&J acted as Jackson Hewitt's agent and that Jackson Hewitt is therefore "vicariously liable" for G&J's violations of state and federal employment law. (Am. Compl. ¶ 82.) Jackson Hewitt, again relying on the "single employer" framework articulated in *Nesbit*, argues that plaintiff's allegations in Count III are insufficient to establish that Jackson Hewitt was her "employer" within the meaning of Title VII and the PHRA and that plaintiff has therefore failed to allege any basis on which Jackson Hewitt is liable to her under those statutes. (Def.'s Mot. 4, 8.) As discussed *supra*, however, the holding in *Nesbit* does not support Jackson Hewitt's contention that the "single employer" doctrine is the only means by which a plaintiff may be jointly employed by two separate entities. As other courts have recognized, where a plaintiff's employer acts as the agent of another entity for employment purposes, the other entity may also be subject to liability under Title VII. Moreover, Jackson Hewitt has not argued that plaintiff failed to allege sufficient facts from which it could be concluded that G&J was Jackson Hewitt's agent. As a result, I will deny Jackson Hewitt's motion to dismiss as to Count III.

As noted *supra*, the term "employee," in the context of statutes such as Title VII, describes the "conventional master-servant relationship as understood by common-law agency doctrine." *Clackamas*, 538 U.S. at 445 (quoting *Darden*, 503 U.S. at 322-23). The "principal guidepost" in determining whether such a relationship exists is the principal's control over the agent, *id.* at 448, particularly the extent to which the master controls the "manner and means of

the agent's performance of work," Restatement (Third) of Agency § 7.07(3)(a).

Although the parties have not cited, and the court has not located, any Third Circuit cases directly on point, courts from other jurisdictions have concluded that an employee may be considered "employed" by a third party as well as by the nominal employer if the third party has a right to control the employee's conduct, either directly or through the third party's control over the employer.[15] *See, e.g.*, *Freeman v. Suddle Enters.*, 179 F. Supp. 2d 1351, 1354 (M.D. Ala. 2001) (In order to establish that they were employed by franchisor under agency theory, "[p]laintiffs must demonstrate that [franchisee's] exercise of authority in the employment context was delegated to it by [franchisor], the true employer, but that [franchisor] reserved the right to control [franchisee's] day-to-day decisions."); *Nealey v. Univ. Health Servs.*, 114 F. Supp. 2d 1358, 1367 (S.D. Ga. 2000) (third party may be subject to Title VII liability if plaintiff's employer delegated "sufficient control of some traditional rights over employees" to that third party); *Miller v. D.F. Zee's*, 31 F. Supp. 2d 792, 806-07 (D. Or. 1998) (focusing on franchisor's real or apparent right to exert control over the franchisee's relationship to its employees); *see also* Barbara T. Lindemann & Paul Grossman, 1 *Employment Discrimination Law* Ch. 21.I.A.3.d (4th ed. 2007) (noting that a plaintiff may sue a third party under Title VII "where an agency relationship between the third party and the employer exists with regard to the plaintiff's employment").

Jackson Hewitt argues that the extent of Jackson Hewitt's alleged control over G&J is insufficient to subject it liability for G&J's actions. According to Jackson Hewitt, because the

---

[15] Outside of the Title VII context, the Third Circuit has recognized that an agency relationship between a franchisor and franchisee may render the franchisor liable for the acts of the franchisee's employees. *See Drexel v. United Prescription Ctrs.*, 582 F.2d 781, 789-90 (3d Cir. 1978).

extent of this control is typical of any franchisor/franchisee relationship, if plaintiff were to prevail then "courts should find substantive consolidation wherever a franchisor/franchisee relationship exists." (Def.'s Mot. 8.) Here, however, Jackson Hewitt has continued to focus on the "substantive consolidation" standard as described in *Nesbit*, not on the common-law agency principles that govern the employer/employee relationship. Although the "mere existence of a franchise relationship does not necessarily trigger a master-servant relationship," neither does it "automatically insulate the parties from such a relationship." *Drexel v. United Prescription Ctrs.*, 582 F.2d 781, 786 (3d Cir. 1978). "Whether the control retained by the franchisor is also sufficient to establish a master-servant relationship depends in each case upon the nature and extent of such control as defined in the franchise agreement or by the actual practice of the parties." *Id.*

The Amended Complaint contains sufficient allegations of Jackson Hewitt's control over G&J for the purposes of plaintiff's employment to state a plausible claim and warrant discovery on the issue. According to plaintiff, Jackson Hewitt required that G&J and its employees submit to training by Jackson Hewitt, required G&J to implement a "zero tolerance" policy for certain employee behavior, and published apparently mandatory codes of conduct that included policies on diversity and non-discrimination. *Cf. Miller*, 31 F. Supp. 2d at 807 (noting that franchisors "had the right to control their franchisees in the precise parts of the franchisee's business that allegedly resulted in plaintiffs' injuries—training and discipline of employees"). Although the Standard Franchise Agreement specifically states that franchisees are not agents of Jackson Hewitt, such disclaimers are not dispositive of the actual existence of an agency relationship when the franchisor actually retains significant control over the franchisee's activities. *See Freeman*, 179 F. Supp. 2d at 1355 (noting that a "boiler-plate waiver" in franchise agreement

should not be dispositive of the existence of an agency relationship between franchisor and employees of franchisee); *Miller*, 31 F. Supp. 2d at 807 (same); *Drexel*, 582 F.2d at 789 (noting that a requirement similar to ¶ 13.11 of the Standard Franchise Agreement (Def.'s Mot. Ex. A) "can hardly be considered anything but a means of dictating the most minute details of how the outlet should be run" and supported the plaintiff's claim that the franchisee was an agent of the franchisor). Accordingly, I will deny Jackson Hewitt's motion to dismiss as to Count III.

### 4. "Apparent or Ostensible Employer" Theory

In Count IV of the Amended Complaint, plaintiff argues that Jackson Hewitt held itself out to be plaintiff's employer and should therefore be considered her "ostensible or apparent employer." (Am. Compl. ¶¶ 83-93.) Jackson Hewitt argues that this count must be analyzed within the "single employer" framework set forth in *Nesbit*. (Def.'s Reply 2.) Jackson Hewitt also argues that plaintiff has failed to allege that her belief in Jackson Hewitt's authority over G&J was reasonable or traceable to statements by Jackson Hewitt and that plaintiff has not clearly stated for which state law torts she intends to hold Jackson Hewitt liable under an "apparent agency" theory. (*Id.* at 3.)[16] I conclude that plaintiff may establish Title VII liability based on Jackson Hewitt's apparent control over G&J. I also conclude that plaintiff has alleged sufficient facts to establish Jackson Hewitt's potential vicarious liability for the state law tort claims. As a result, I will deny Jackson Hewitt's motion to dismiss Count IV.

As with respect to Counts III and V, Jackson Hewitt argues that questions of apparent authority are relevant in a Title VII context only to the extent that they support a "single

---

[16] Both parties appear to use the terms "apparent agency" and "apparent employer" interchangeably. (*See* Pl.'s Opp. 11-13 (referring to "'apparent authority' theory of liability" in discussion of Count IV); Def.'s Reply 3 (same).) I will use the term "apparent employer" when discussing plaintiff's Title VII and PHRA claims as set forth in Count IV and "apparent agency" when discussing plaintiff's state law tort claims in that same count.

employer" claim pursuant to *Nesbit*, and that plaintiff's allegations do not sufficiently support such a claim. Again, however, *Nesbit*'s "single employer" test is not the exclusive means by which a plaintiff may hold two entities liable for the same employment action. I therefore look to other case law in order to ascertain whether plaintiff's "apparent employer" claim is viable.

Few Title VII cases have addressed whether an entity that held itself out to be the employer of the plaintiff, despite the absence of such a relationship, is liable as an "employer" under Title VII. *See, e.g., Miller*, 31 F. Supp. 2d at 808 (where there was "no indication in the restaurant that the restaurant was owned by a franchisee," the franchisor's trademark was prominently displayed in the restaurant, and all plaintiffs believed they were employees of the franchisor, there was substantial issue of material fact as to whether franchisor was plaintiffs' employer by virtue of its apparent authority over franchisee). I am unable to find any cases in the Third Circuit that directly address this issue in the context of Title VII or any similar employment discrimination statute. *Cf. Beuff Enters. Fla. v. Villa Pizza*, No. 07-2159, 2008 U.S. Dist. LEXIS 50591, at *30 (D.N.J. June 25, 2008) (discussing *Miller* but distinguishing it on its facts).

In the absence of any binding precedent on the issue in the Title VII context, the court looks to the general common-law agency principles as required by the Supreme Court's decision in *Clackamas*, 538 U.S. at 445. Courts applying common-law agency principles have long recognized that "[i]f the principal holds out the agent to the world, as a general agent in the transaction of his business, any contract made by him, within the scope of that business, will bind the principal; although there may be, as between the principal and agent, a restriction upon the general authority of the latter; if the person with whom the contract is made has no notice of such restriction." *Murphy v. Beverly Hills Realty Corp.*, 98 Pa. Super. 183, 187 (1930) (quoting *Williams v. Getty*, 31 Pa. 461 (1858)). The doctrine of apparent authority applies to employment

25

contracts into which the apparent agent enters on behalf of the principal just as it applies to any other contract. *See id.*

Plaintiff may therefore establish that Jackson Hewitt was her employer provided that she shows that, as a result of some representation by Jackson Hewitt, plaintiff believed G&J or its employees to be agents of Jackson Hewitt with the authority to create an employment relationship between her and Jackson Hewitt. *See id.* (finding that, where company had portrayed an individual as its agent and that individual had purportedly hired the plaintiff to work for the company, plaintiff was entitled to enforce the employment contract against the company directly). This is the legal theory on which plaintiff relies in Count IV. (*See* Am. Compl. ¶¶ 91-92 (discussing Jackson Hewitt's "apparent authority" to control G&J); Pl.'s Opp. 11-13 (elaborating on the legal basis for relief in Count IV of the Amended Complaint).)

Jackson Hewitt argues that the Amended Complaint alleges no facts that could have given rise to a reasonable belief that G&J was acting as Jackson Hewitt's agent for the purposes of employment. However, all of Jackson Hewitt's arguments along these lines focus on whether or not plaintiff could have reasonably believed that G&J was the same entity as Jackson Hewitt, which is a separate question. (*See, e.g.,* Def.'s Mot. 6; Def.'s Reply 3 (arguing that plaintiff was aware, once she began receiving her paychecks, that G&J was a separate entity from Jackson Hewitt).) Because the separate legal existence of the principal and agent is inherent in any common-law agency relationship, a third party's knowledge that an apparent agent is distinct from the principal cannot render unreasonable that party's belief that the apparent agent has authority to act on the principal's behalf.[17] *See* Restatement (Third) of Agency § 1.01 cmt. c

---

[17] This is not to say that plaintiff's ignorance of G&J's separate existence from Jackson Hewitt would necessarily be inconsistent with her "apparent employer" claim.

("Despite their agency relationship, a principal and an agent retain separate legal personalities. Agency does not merge a principal's personality into that of the agent, nor is an agent, as an autonomous person or organization with distinct legal personality, merged into the principal.").

*Spignesi v. Warner-Jenkinson*, No. 02-5366, 2004 WL 350760, at *1 (E.D. Pa. Jan. 29 2004), which Jackson Hewitt cites in support of its argument, is therefore distinguishable. That case does no more than acknowledge the basic fact that apparent agency will not exist when the plaintiff was aware that the agent was acting outside the limits of his authority. Plaintiff alleges that she was not aware of the limitations on G&J's or Nolan's authority to hire her on behalf of Jackson Hewitt or of the limitations on Jackson Hewitt's control over G&J's employment decisions. (*See* Am. Compl. ¶¶ 84-85, 91.) The Amended Complaint does not allege, for example, that plaintiff was a party to the Standard Franchise Agreement or that she read any part of that agreement during her employment, nor does Jackson Hewitt argue that plaintiff failed to exercise "reasonable diligence" by failing to read the franchise agreement before beginning her employment. *Cf. Great N. Ins. Co. v. ADT Sec. Servs.*, 517 F. Supp. 2d 723, 746 (W.D. Pa. 2007) (citing *Bolus v. United Penn Bank*, 363 Pa. Super. 247, 525 A.2d 1215, 1222 (Pa. Super. Ct.1987)) (noting that where a third party has no actual knowledge of limitations on agent's authority, "the third party is required to exercise only reasonable diligence to ascertain the agent's authority").

Jackson Hewitt further argues that plaintiff "fails to allege some form of communication *by Jackson Hewitt* that instilled a reasonable belief in her mind that Garfield & Johnson had authority to act on Jackson Hewitt's behalf in regard to any employment decision." (Def.'s Reply 3 (emphasis in original).) However, plaintiff has alleged that she received communications from Jackson Hewitt itself, including the contents of Jackson-Hewitt-published training materials and

employee codes of conduct. (Am. Compl. ¶¶ 16, 17, 74, 78, 90.) Plaintiff has alleged that these materials failed to clarify the relationship between G&J and Jackson Hewitt and reinforced plaintiff's belief that she was a Jackson Hewitt employee. (*Id.* ¶¶ 86, 91.) In fact, those materials themselves, to which I may refer because plaintiff discussed their contents in the Amended Complaint, address the reader as an "employee" of Jackson Hewitt. (*See* Pl.'s Opp. 12; *id.* Ex. I.) Moreover, Jackson Hewitt employees supervised plaintiff's work and communicated with her regarding problems with tax returns and with the tax preparation software.(Am. Compl. ¶¶ 89-90.)

With respect to the state tort law claims that plaintiff asserts in Count IV, Jackson Hewitt argues that plaintiff "never specifies for which torts she would hold Jackson Hewitt liable."[18] (Def.'s Reply 3.) Plaintiff does so specify. In Count IV of the Amended Complaint—the only count in which plaintiff makes an "apparent authority" claim—plaintiff states that, "as the ostensible or apparent employer, Jackson Hewitt is liable to plaintiff for Garfield & Johnson's violations of Title VII and the Pennsylvania Human Relations Act as well as all state law tort claims as set forth elsewhere herein." (Am. Compl. ¶ 93.)[19]

---

[18] Pennsylvania recognizes that a principal may be liable for certain torts of its apparent agent. *See Loyle v. Hertz Corp.*, 940 A.2d 401, 407-08 (Pa. Super. Ct. 2007). *But see Myszkowski v. Penn Stroud Hotel*, 634 A.2d 622, 629-30 (Pa. Super. Ct. 1993) (expressing skepticism as to whether doctrine of apparent authority was applicable to tort context).

[19] Plaintiff also seeks to hold Jackson Hewitt liable for the same state tort law claims, using substantially identical language, in two of the other counts against Jackson Hewitt. (*See* Am. Compl. ¶¶ 82 (Count III), 96 (Count V).) It is therefore unclear why Jackson Hewitt has chosen to challenge Count IV alone as vague in this regard.

Accordingly, I conclude that plaintiff has stated a claim for relief based on G&J's apparent authority to employ plaintiff on behalf of Jackson Hewitt. I will deny Jackson Hewitt's motion to dismiss Count IV of the Amended Complaint.[20]

**B. Plaintiff's Negligence Claim**

Count VI of plaintiff's complaint appears to state a common-law claim for negligence against Jackson Hewitt. Jackson Hewitt's primary argument with regard to plaintiff's negligence claim is that Jackson Hewitt owed no duty to plaintiff to ensure that its franchisees obeyed anti-discrimination laws. (Def.'s Mot. 9.) I agree and will dismiss Count VI of plaintiff's complaint.

In briefing this issue, neither party has identified any relevant authority on the question of whether a franchisor owes any common-law duty to the franchisee's employees. *Miller*, the only case that plaintiff cites on the issue, was applying Oregon law. *See* 31 F. Supp. 2d at 808 (holding that the employees of a franchisee had "claims of direct liability against [defendant] for negligent training and negligent enforcement of the Franchise Operations Manual policies"). Pennsylvania law, on the other hand, does not appear to provide plaintiff with any common-law right to relief against Jackson Hewitt, either under the "assumption of duty" doctrine or the doctrine requiring masters to control their servants, which are the only doctrines that appear to be applicable in plaintiff's situation.

Pennsylvania recognizes that an individual who gratuitously seeks to confer a benefit on another may be subject to liability for failure to take due care in so doing. *See Morena v. S. Hills*

---

[20] Assuming that plaintiff is able to determine that G&J and the individual defendants are financially able to pay any judgment that might result from this litigation, plaintiff may decide not to pursue her claims against Jackson Hewitt as a tactical matter since the presentation of these claims and theories to a jury will clearly complicate the task of the jury and may divert the jury from its main responsibilities to determine whether there is any liability on the part of G&J and its employees and, if so, the amount of the damages.

*Health Sys.*, 462 A.2d 680, 684 (Pa. 1983).[21] The standard for determining when such liability

exists is governed by the Restatement of Torts, which imposes a duty of reasonable care on

persons who undertake to provide a service to another that is necessary for the protection of the

other person or to third parties. *Id.*; Restatement (Second) of Torts §§ 323, 324A (1965).

However, these provisions of the Restatement impose liability only for *physical* harm resulting

from the actor's failure to exercise reasonable care. Restatement (Second) of Torts §§ 323, 324A;

*see also Sound of Mkt. St., Inc. v. Cont'l Bank Int'l*, 819 F.2d 384, 392 (3d Cir. 1987) (discussing

section 323 of the Restatement). Plaintiff has not claimed that she suffered physical harm as a

result of Jackson Hewitt's negligence. (Am. Compl. ¶ 104.)

    The Restatement also imposes a duty on a master to exercise such control over his or her

servant as to "prevent [the servant] from intentionally harming others or from so conducting

himself as to create an unreasonable risk of bodily harm to them." Restatement (Second) of Torts

§ 317.[22] However, this duty attaches only (1) when the servant is on the master's premises, on

premises upon which the servant may only enter in his capacity as servant, or using the master's

chattels; and (2) when the master not only knows or has reason to know that he or she has the

ability to control the servant's conduct, but also knows or has reason to know that such control is

---

[21] The franchise agreement states that any action against Jackson Hewitt that "in any way arises out of or relates to [the franchisee's] franchise relation with us" shall be governed by New Jersey law, except that the New Jersey Franchise Practices Act shall not apply to a franchisee whose assigned location is outside of New Jersey. (Def.'s Mot. Ex. B, ¶ 28.1.) Because neither party has mentioned this provision in their arguments and because plaintiff is not a party to the franchise agreement, I apply Pennsylvania law when assessing the relationship between plaintiff and Jackson Hewitt. *Cf. Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 465 n.14 (D.N.J. 2009) (declining to apply contract's choice of law provision to a third party beneficiary, absent explicit contractual language making the provision applicable to the third party).

[22] In *Austin v. Norfolk S. Corp.*, 158 F. App'x 374, 379 n.2 (3d Cir. 2005), the Third Circuit declined to decide whether a claim pursuant to section 317 requires proof of bodily injury.

necessary. *Id.* Plaintiff has not alleged that Johnson's or Nolan's behavior took place on, or that Johnson or Nolan used, Jackson Hewitt's property.

As a result, it does not appear that plaintiff has stated a common-law negligence claim against Jackson Hewitt.[23] To the extent that Count VI of the Amended Complaint asserts such a claim, I will dismiss it.

## IV. Conclusion

Plaintiff has alleged sufficient facts to raise a plausible claim that she was Jackson Hewitt's employee for the purposes of Title VII and the PHRA. In particular, plaintiff may be able to show: (1) that Jackson Hewitt directly exercised significant control over plaintiff's daily activities; (2) that Jackson Hewitt exercised, through its authority to control G&J's operations, significant control over plaintiff's daily activities; or (3) that Jackson Hewitt authorized or ratified G&J's representations to plaintiff that Jackson Hewitt was plaintiff's sole or joint employer. I will therefore deny Jackson Hewitt's motion to dismiss Counts III through V. However, because plaintiff has failed to identify a common-law duty on the part of Jackson Hewitt to protect plaintiff from the type of harm from which she complains, I will dismiss plaintiff's common-law negligence claim against Jackson Hewitt.

---

[23] I express no opinion on whether the issue of Jackson Hewitt's negligence will ultimately be relevant to plaintiff's Title VII and PHRA claims against Jackson Hewitt.